In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 22-3268 and 23-1022

F.C. BLOXOM COMPANY,

*Plaintiff-Appellant*,

*v.*

TOM LANGE COMPANY INTERNATIONAL, INC., doing business as SEVEN SEAS FRUIT,

*Defendant-Appellee*.

_____

F.C. BLOXOM COMPANY, doing business as F.C. BLOXOM INTERNATIONAL,

*Petitioner-Appellant*,

*v.*

JASON LAYE,

*Respondent-Appellee*.

_____

Appeals from the United States District Court for the
Central District of Illinois.
Nos. 3:20-cv-3147 & 3:22-mc-03005 — **Sue E. Myerscough**, *Judge.*
_____

ARGUED OCTOBER 30, 2023 — DECIDED JULY 25, 2024

_____

Before EASTERBROOK, RIPPLE, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge.* This appeal presents a dispute under the Perishable Agricultural Commodities Act, a Depression-era statute that regulates the market for fresh fruits and vegetables. Seven Seas Fruit initiated administrative proceedings against F.C. Bloxom Company under the Act when Bloxom refused to pay for three loads of onions. The Secretary of Agriculture found for Seven Seas, and Bloxom exercised its statutory right to what the Act calls a "trial de novo" in federal district court. Agreeing with the findings of the Secretary, the district court entered summary judgment for Seven Seas. Bloxom challenges that ruling on appeal. Seeing no reversible error, we affirm.

## I

### A

F.C. Bloxom Company is a Seattle-based distributor, importer, and exporter of fresh produce. The company does not itself grow fruits or vegetables but instead acquires them from suppliers for resale to customers in the domestic and international markets.

In August 2018, Bloxom's Brian Bernard received a call from a customer in Honduras seeking to import U.S. No. 1 grade onions. Bernard tapped his colleague Alejandro Hernandez to help fill the order. Hernandez reached out to Seven Seas salesman Jason Laye to see if Seven Seas could supply the onions. Seven Seas agreed to do so, and the two sides hammered out a deal. Their agreement required Seven Seas to deliver three loads of onions to the Port of Long Beach in California, for transport via an oceangoing container ship—the

MSC Channe—that was slated to set sail for Honduras on August 14.

In the course of the parties' negotiations, one item seemed to go overlooked. Honduras, like most countries, requires shipments of fruits and vegetables to undergo inspection for plant-borne pests and diseases before it will allow them to enter the country. These inspections must be conducted in the produce's country of origin by a designated authority, most often a government agency. Only if that entity issues a so-called phytosanitary certificate declaring the inspected produce safe for export will Honduran customs officials let it into the country. In Bloxom's case, this meant that each load of onions had to be inspected by the U.S. Department of Agriculture before they left the Port of Long Beach.

At no point during the contract negotiations did the parties expressly discuss the phytosanitary certificates. Bloxom's Brian Bernard nonetheless came to believe that Seven Seas' Jason Laye would procure the certificates. Laye not only had procured certificates for previous sales, but also, during the negotiations of this new transaction, offered vague assurances that that if Bernard secured space for the onions on the MSC Channe, he would "take care of the rest."

Bloxom claims to have had a second reason to believe that Laye would procure the certificates. It insists that it emailed purchase orders to Laye that explicitly stated that the certificates would be "provided by Seven Seas." The purchase orders further specified that Seven Seas would fax Bloxom copies of those certificates "before" the onions were loaded onto the MSC Channe.

But there was a gap, and that gap proved consequential. Seven Seas resolutely denied receiving these purchase orders or otherwise agreeing to procure the certificates. And at no point has Bloxom supplied concrete proof that they were sent.

In the days following their negotiations, neither party arranged for a phytosanitary inspection, leaving the onions to arrive at the Port of Long Beach without the certificates necessary to clear Honduran customs. Even then, though, the Department of Agriculture could have performed an inspection at the port itself. But Bloxom believed that the phytosanitary certificates were in place, despite Seven Seas' failure to fax copies as the purchase orders required. So, on August 13, Bloxom took no action as the onions were loaded onto the MSC Channe. They set sail for Honduras the next day—uninspected and indeed now uninspectable.

Reality dawned slowly. It was not until the onions approached Honduras that Bloxom began asking about the certificates. On August 23, and again on August 27, Bernard asked Laye for a copy of "the phyto" for each load of onions. Laye responded that "[t]he shipper is FedEx directly to Honduras." Bernard apparently took this to mean that the phytosanitary certificates had been procured by the company that grew the onions and that this third-party would FedEx them directly to Bloxom's customer in Honduras. On this understanding, Bernard asked Laye to "have them send [him] a copy via email." No email followed.

Pressure mounted once the onions arrived in Honduras. On September 1, Bernard informed Laye that Bloxom's customer could not "get the containers of onions" out of the port because it "never got the phytos." Bernard asked Laye whether he had "a scan" of the certificates that he could send

him and stressed that he "really need[ed] it ASAP." Laye replied that he "emailed the shipper and requested" copies. On September 4, Bernard texted Laye that "[t]he Honduras customer [was] all over [him]" and pleaded with him to "work on the Phytos as soon as possible tomorrow morning." That evening Laye informed Bernard of the worst possible news: no phytosanitary inspection had taken place. Now Bloxom had a major problem on its hands, for there was no way to obtain phytosanitary certificates in Honduras and, consequently, no way to deliver the onions to the buyer.

To salvage the situation, Bloxom and Seven Seas began brainstorming alternative outlets for the onions. On September 9, Bernard raised the possibility of selling them to customers in Trinadad or the Dominican Republic. But these efforts did not pan out, and the onions remained in quarantine in Honduras. After much consternation, Bloxom had no choice but to ship the onions back to the United States.

Jason Laye proposed shipping the onions to Jacksonville, Florida, where Seven Seas had contacts that might be willing to acquire them. Bloxom agreed to the proposal, and the onions took to sea a second time.

The onions arrived in Jacksonville on December 18, 2018. But the return shipping company would not release the onions until freight charges totaling $21,135 were paid. For several weeks, Bloxom and Seven Seas could not agree on which company should bear those expenses. And as long as the fees went unpaid, the onions could not be inspected for quality, let alone resold. So the onions sat.

Eventually Bloxom and Seven Seas resolved the disagreement. In a letter agreement, which Bloxom signed on

February 5, 2019, Seven Seas agreed to pay the $21,135 ship-ping fee "on behalf of Bloxom Company … in order to facili-tate release of the Onions." The parties also formalized the terms of the consignment arrangement they had worked out in principle before. Bloxom expressly agreed to release the on-ions to Seven Seas as Bloxom's consignee. As consignee, Seven Seas agreed to "perform an inspection" and, should they be found "salvageable/marketable," to "place the Onions for Bloxom Company's account." The letter agreement made clear that although Seven Seas would take physical posses-sion of the onions, "at no time [would] ownership transfer from Bloxom Company to Seven Seas."

Once Seven Seas paid the return shipping fee, Bloxom re-leased the onions for inspection. Only then did it become clear that the onions had spoiled. So Seven Seas had them de-stroyed.

B

This suit arose from Seven Seas' efforts to exact full payment for the onions at the agreed-upon price. When Bloxom refused to pay—citing Seven Seas' failure to procure the certificates—Seven Seas commenced administrative proceedings against Bloxom under the Perishable Agricultural Commodities Act.

Congress enacted that statute to combat "unfair and fraudulent practices" in the interstate market for highly per-ishable agricultural commodities like fresh fruits and vegeta-bles. Pub. L. 71–325. To further that objective, the Act created a federal cause of action against regulated entities (like Bloxom and Seven Seas) that engage in any one of a number of unfair trade practices. See 7 U.S.C. § 499e(b) (creating cause

of action); *id.* § 499b(1)–(7) (enumerating unfair trade practices). Injured persons can file a lawsuit directly in state or federal court. See *id.* § 499e(b). But they can also seek reparations in proceedings before the U.S. Department of Agriculture. See *id.*

Seven Seas elected the administrative path. It sought relief from Bloxom under § 499b(4), which makes it an unfair trade practice to, among other things, "fail or refuse … [to] make full payment promptly in respect of any transaction in any [covered] commodity to the person with whom such transaction is had." Bloxom counterclaimed, seeking damages for Seven Seas' failure to procure the phytosanitary certificates.

The Secretary of Agriculture ultimately found in favor of Seven Seas. Its reasoning was straightforward. Seven Seas denied receiving the purchase orders, and Bloxom, for its part, was unable to prove that they had been sent. This proved fatal to Bloxom's position because the company had not come forward with evidence that the duty to procure certificates was otherwise delegated to Seven Seas during the negotiations. Without evidence of such delegation, Bloxom could not get out of its contractual obligation to pay for the onions at the contract price and was not entitled to damages on its counterclaim.

The Secretary made another finding that would prove important to subsequent litigation and, indeed, to this appeal: breach or no breach, Bloxom "accepted the subject loads of onions" at the Port of Long Beach despite Seven Seas' failure to fax it copies of the phytosanitary certificates "prior to loading" as the purchase orders required.

C

Bloxom appealed the Secretary's ruling to federal district court. See *id.* § 499g(c). The term "appeal" here is a bit of a misnomer. The Act states that a party that appeals an administrative reparation order to a federal district court is entitled to "a trial de novo" that "shall proceed in all respects like other civil suits for damages." *Id.* The only difference between the path Bloxom chose and an original suit for damages under § 499e(b) is that "the findings of fact and order or orders of the Secretary" serve as "prima-facie evidence of the facts therein stated." *Id.* § 499g(c). This simply means that "the facts found by the Secretary shall stand as the established facts until sufficient evidence is produced on the trial to overcome them." *Farris v. Meyer Schuman Co.*, 115 F.2d 577, 579 (7th Cir. 1940); see also *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1032–33 (D.C. Cir. 1988).

The district court set an initial discovery deadline of September 30, 2021. From the outset, the focus of discovery was on the purchase orders and, to a lesser extent, on evidence that might show that, during the contract negotiations, Bloxom delegated the duty to procure phytosanitary certificates to Seven Seas.

It quickly became apparent that more time would be needed. The district court demonstrated considerable patience and three times extended the discovery deadline.

As the litigation dragged on, the relationship between the parties grew increasingly acrimonious. Bloxom came to believe that Seven Seas and Jason Laye were withholding information critical to its theory of the case. And Seven Seas grew increasingly frustrated with the scope of Bloxom's discovery

requests, which it felt was not commensurate with the litiga-
tion's modest financial stakes. Amid that fractious backdrop,
Seven Seas filed an early motion for summary judgment.

Although three months of discovery remained, Seven Seas
urged the district court to bring the litigation to a close. Its
principal reason for that outcome had to do with the purchase
orders. After years of litigation and ample discovery, Bloxom
remained unable to point to any evidence proving that it sent
Seven Seas the purchase orders. Nor could Bloxom point to
evidence showing the company delegated to Seven Seas an
obligation to obtain the phytosanitary certificates during the
negotiations themselves.

Seven Seas saw an early award of summary judgment as
warranted for a second reason. Even assuming the company
breached a duty to procure phytosanitary certificates, Bloxom
could not prevail because it accepted the onions at the Port of
Long Beach under Article 2 of the Uniform Commercial Code
without then ever later revoking that acceptance.

Bloxom responded to Seven Seas' summary judgment
motion by filing a floodtide of discovery requests. For good
measure, Bloxom filed a motion to compel against Laye in a
federal district court in Florida, where Laye lived. See Fed. R.
Civ. P. 45(d)(2)(B)(i). (That action was later transferred to the
Central District of Illinois and assigned to the same judge
handling Bloxom's appeal from the Secretary's decision.)
Believing these efforts to be futile, Seven Seas sought a stay of
all discovery. As it saw things, nothing could change two
bottom-line realities: Bloxom never sent Seven Seas purchase
orders evidencing the certificate requirement, and even if
such an obligation did exist, Bloxom had waived the
requirement by taking possession of the onions at the Port of

Long Beach and shipping them to Honduras without any certificates in hand.

Bloxom disagreed and pleaded for more time under Federal Rule of Civil Procedure 56(d), which "permits a district court to delay consideration of a summary judgment motion and order additional discovery before ruling if the non-movant demonstrates that 'it cannot present facts essential to justify its opposition.'" *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627–28 (7th Cir. 2014) (quoting Fed. R. Civ. P. 56(d)). Bloxom supported that request with sworn declarations explaining why it needed yet more time for discovery and what kinds of information it expected additional discovery to uncover.

The district court did not rule on Seven Seas' requested stay or on Bloxom's motion under Rule 56(d), so discovery proceeded apace. In the closing weeks of discovery, Bloxom's flurry of discovery activity became an avalanche. In rapid succession, Bloxom filed a motion seeking permission to take more than ten depositions, a motion seeking additional time to depose Alejandro Hernandez (who no longer worked at Bloxom), and two motions to compel. And with just four days remaining in discovery, Bloxom filed a renewed Rule 56(d) motion, moved for a fourth extension of the discovery deadline, and sought leave to supplement its brief opposing summary judgment. The district court permitted Bloxom to supplement its opposition brief but did not otherwise act on these requests.

And in the end, it never did. On November 22, 2022, months after the close of discovery, the district court entered summary judgment against Bloxom on both of the grounds urged by Seven Seas. See *F.C. Bloxom Co. v. Tom Lange Co. Int'l,*

*Inc.*, 642 F. Supp. 3d 775 (C.D. Ill. 2022). It determined that no reasonable trier of fact could find that Bloxom had delegated the task of procuring phytosanitary certificates to Seven Seas. See *id.* at 783. It also concluded that Seven Seas was entitled to summary judgment under the Uniform Commercial Code. Breach or no breach, the record conclusively established "that Bloxom accepted the onions, did not reject the onions at the Port of Long Beach, [and] [n]ever revoked [that] acceptance." *Id.* at 787. Because none of the discovery sought by Bloxom would have altered these conclusions, the district court denied all requests for more discovery. *Id.* at 786.

The district court entered final judgment soon thereafter—in both Bloxom's appeal and in the ancillary action it brought against Jason Laye. Bloxom filed timely notices of appeal in both cases, and we have consolidated them for decision.

**II**

Bloxom challenges the district court's summary judgment ruling on two grounds. Its principal objection goes to timing. In Bloxom's view, the district court abused its discretion denying its Rule 56(d) motions and should have instead given it the additional time it sought to develop the record before ruling on Seven Seas' motion for summary judgment. In the alternative, Bloxom contends that unresolved questions of material fact precluded the entry of summary judgment even on the record that the district court did consider.

Before turning to these contentions, we pause to emphasize that our analysis takes as its starting place assumptions by the parties that may or may not be legally sound. Seven Seas and Bloxom have litigated this case on the shared understanding that the Uniform Commercial Code's standards for

acceptance, rejection, and revocation are relevant to determining the scope of liability under 7 U.S.C. § 499b. Both in the district court and on appeal, Seven Seas has maintained that breach or no breach, Bloxom cannot prevail if it accepted the onions under § 2-606 of the UCC and did not revoke that acceptance under § 2-608. Rather than fight the legal premises underlying this contention, Bloxom has joined issue only on the facts, insisting alternatively that it did not accept the onions, that it did so in reasonable reliance on statements suggesting that the phytosanitary certificates were in place, or that it revoked its acceptance after learning that the certificates had not been procured. By litigating in this manner, Bloxom has implicitly accepted Seven Seas' framing of the case and waived any legal arguments that could be raised against it. See *O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009) (arguments not raised on appeal are waived).

We underscore this point because the parties have left several legal questions unexamined in both the district court and on appeal. For one, the UCC does not appear to support the dispositive importance placed by the parties on acceptance. Section 2-607(2) of the UCC makes clear that "acceptance does not of itself impair any other remedy provided by this Article for non-conformity." More broadly, it is not even clear that the UCC applies in the first place. The Perishable Agricultural Commodities Act does not incorporate the UCC, or any other source of state law for that matter. And its implementing regulations define many of the critical terms used in 7 U.S.C. § 499b, including "reject without reasonable cause," 7 C.F.R. § 46.2(bb), and "acceptance," *id.* at § 46.2(dd). Although it is certainly possible that the UCC could supplement those provisions as a matter of federal common law, we have never

expressly held that it does and deciding that question would call for careful analysis.

None of the analysis that follows should be read to express any view on how these and other issues might be resolved in future cases.

## A

As for the merits, we begin on the substantive front with Bloxom's challenge to the district court's summary judgment ruling. We do so without deference to the analysis of the district court, drawing all reasonable inferences in the light most favorable to Bloxom. See *Chi. Reg'l Council of Carpenters Pension Fund v. Schal Bovis, Inc.*, 826 F.3d 397, 402 (7th Cir. 2016).

When a district court enters summary judgment on multiple independent grounds, reversal is appropriate only if *none* of those grounds is supported by the record. What that means here is that Bloxom must prove that a reasonable trier of fact could find two things: first, that it delegated to Seven Seas the duty to procure phytosanitary certificates and, second, that it either did not accept the onions at the Port of Long Beach under § 2-606 of the UCC or that it validly revoked that acceptance under § 2-608. Because Bloxom's inability to make the second of these two showings is clear, we focus on acceptance and revocation without considering the antecedent question of whether a reasonable jury could find that Seven Seas bore the burden of procuring phytosanitary certificates for the onions.

Which brings us to yet another issue. Neither the district court nor the parties have taken a position on *which* version of the UCC applies to this case. They have instead drawn disparately on the law of no fewer than four states. Seven Seas

insists that "[n]o choice of law analysis is required because Article 2 of the UCC has been adopted" in every state whose law could conceivably apply. Although we follow the thinking, we do not agree. That two states have enacted the same version of the UCC does not mean that their respective courts have interpreted those provisions the same way. When those interpretations conflict, a choice must be made between one state's law and the other's, even if the provisions are identical. Neither Seven Seas nor Bloxom has identified any such conflict in this case, and both have drawn heavily on Illinois law. We will do so as well, without deciding what rules would govern the choice-of-law analysis were there a conflict.

Under Illinois's codification of the UCC, "[a]cceptance of goods occurs when the buyer" does one of three things:

> (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
>
> (b) fails to make an effective rejection [under § 5/2-602(1)], but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

810 ILCS 5/2-606(1)(a)–(c). The district court held that Bloxom accepted the onions under § 606(1)(c). See *F.C. Bloxom Co.*, 642 F. Supp. 3d at 785. We see no error with that conclusion. It is difficult to imagine an act more "inconsistent with" Seven

Seas' ownership of the onions than shipping them to a foreign country for sale to a customer with whom Seven Seas has no contractual relationship. 810 ILCS 5/2-606(1)(c). We note, too, that Bloxom did so with full knowledge that Seven Seas had failed to fax copies of the phytosanitary certificates and that the onions could not be inspected outside of the United States. Although it could have taken steps to investigate the status of the phytosanitary certificates before the onions left port, it did not do so, eliminating any possibility that the problem could be addressed and the consequences minimized.

We also agree with the district court's assessment that Bloxom did not revoke that acceptance, even after learning that the phytosanitary certificates had never been procured. For revocation to be effective under § 5/2-608, it "must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects." *Id.* § 5/2-608(2). Bloxom first learned that the phytosanitary certificates had not been procured on September 4. At no point in the months that followed did Bloxom notify Seven Seas of an intent to revoke.

To the contrary, Bloxom doubled down on its ownership in the letter agreement it signed settling the dispute over the cost of shipping the onions to Jacksonville. That agreement stated unequivocally that "ownership" of the onions would not "transfer from Bloxom Company to Seven Seas" during the time that Seven Seas attempted to sell them on consignment. At the time Bloxom signed this agreement, the non-existence of the phytosanitary certificates had been known for months. In full possession of this information,

Bloxom took steps to reinforce, rather than disavow, its ownership of the onions.

The combination of Bloxom's conduct at the Port of Long Beach and the contents of the letter agreement leave us with no doubt that the district court was right to enter summary judgment for Seven Seas.

B

We close by addressing Bloxom's contention that the district court was wrong to rule on Seven Seas' summary judgment motion without giving it additional time to develop the record. Our review of that claim is only for an abuse of discretion, see *Arnold v. Villarreal*, 853 F.3d 384, 389 (7th Cir. 2017), and we see none.

Federal Rule of Civil Procedure 56(b) authorizes parties to move for summary judgment "at any time" until 30 days after the close of discovery, regardless of whether discovery has been completed or even begun. See *Waterloo Furniture Components, Ltd. v. Haworth, Inc.*, 467 F.3d 641, 648 (7th Cir. 2006) ("Rule 56 does not require that discovery take place in all cases before summary judgment can be granted."). This flexibility reflects the foundational premise that discovery is not an end unto itself, but rather only a means of determining whether there are genuine issues of material fact that necessitate a trial. When evidence comes to light that conclusively establishes or conclusively forecloses a party's entitlement to relief, further discovery becomes futile and wasteful. Rule 56(b), in short, allows and indeed encourages parties under these circumstances to use summary judgment to bring litigation to a "just, speedy, and inexpensive" end. See Fed. R. Civ. P. 1.

For its part, Rule 56(d) protects non-movants who believe a summary judgment motion has been filed prematurely. It "permits a district court to delay consideration of a summary judgment motion and order additional discovery before ruling if the non-movant demonstrates that 'it cannot present facts essential to justify its opposition.'" *Sterk*, 770 F.3d at 627–28 (quoting Fed. R. Civ. P. 56(d)). A party seeking to invoke the rule must support their request with a sworn "affidavit or declaration" that gives "specific reasons discovery should be extended." *Smith v. OSF Healthcare Sys.*, 933 F.3d 859, 864 (7th Cir. 2019).

A Rule 56(d) affidavit must do more than express "a fond hope" that additional discovery would uncover useful evidence. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 877 (7th Cir. 2021). It must instead identify with specificity the information that additional discovery is expected to uncover. Even more, it must explain how that information would allow the non-movant to proceed to trial on the legal theory articulated by its adversary. As we have recognized many times over the years, a district court need not permit discovery that would make no difference. See *Grayson v. O'Neill*, 308 F.3d 808, 816 (7th Cir. 2002); *Arnold*, 853 F.3d at 389; *Jimenez v. Kiefer*, 100 F.4th 931, 939 (7th Cir. 2024).

Applying these principles here, the district court acted well within its discretion in denying Bloxom's Rule 56(d) motions. Bloxom supported its motions with declarations from its counsel. Those declarations focused almost exclusively on information related to the conduct of Jason Laye, information that would prove useful to establishing that Seven Seas bore the burden of procuring phytosanitary certificates. But that information had no obvious relevance to Seven Seas'

alternative, UCC-based theory for summary judgment. No-
where did Bloxom's counsel even attempt to explain how ad-
ditional discovery would allow it to survive summary judg-
ment on that issue. Under these circumstances, the district
court was free to determine that additional discovery was not
warranted. We see no abuse of discretion in the district court
concluding that it was time for this litigation to end.

For these reasons, we AFFIRM.